Filed 10/20/25  In re S.L. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| In re S.L., a Person Coming Under the Juvenile Court Law. | |
| YUBA COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.L.,<br><br>Defendant and Appellant. | C103402<br><br>(Super. Ct. No. JVSQ2400140) |

J.L. (mother) appeals from the juvenile court's jurisdictional and dispositional order.  Mother contends the petition failed to state a cause of action and there was insufficient evidence to support jurisdiction.  We will reverse the order with respect to allegation g-1 and direct the juvenile court to dismiss that allegation from the petition.  In all other respects, we will affirm.

BACKGROUND

A. *Current Petition*

The day after S.L. was born, a social worker from the Riverside County Department of Public Social Services -- Children's Services Division (Riverside County)

1

met with mother in the hospital. Mother was a resident of Yuba County, but she was serving two years at the Chino Institution for Women in Corona, California. Mother admitted to the social worker that she had a criminal history as well as a history of substance abuse but would not answer questions about her sobriety. Mother also identified S.L.'s father, who was recently sentenced to prison.

The social worker spoke with mother's nurse, who reported that mother delivered S.L. by cesarean section at 39 weeks. Mother had a history of methamphetamine use but tested clean in the hospital. She was taking only acetaminophen after the surgery. Mother gave the social worker paperwork showing that she received prenatal care in prison. With approximately seven months remaining on her sentence, mother filled out a form to release S.L. either to "the maternal step-aunt" L.H. or "the maternal great aunt" C.G., both of whom live in Yuba County.

The social worker spoke with L.H. and C.G. L.H. had known mother for seven years and arranged with mother to take legal guardianship of S.L. until mother completed her sentence. L.H. admitted to having "a CPS case in 1998 for methamphetamine usage" but said she had "turned her life around." C.G. also told the social worker she was prepared to take custody of S.L. C.G. admitted to having a criminal record and a history of methamphetamine use, but she had been clean since 2017.

The Riverside County social worker spoke to a social worker with the Yuba County Health and Human Services Department/Child and Adult Protective Services (Department) about mother and S.L. The Yuba County social worker expressed concern about giving the newborn minor to either of the caregivers identified by mother. Both caregivers had "substantiated child welfare history that would prevent them from obtaining custody" of S.L. and, in that moment, the details of their criminal history were unknown. The Riverside County social worker had not been able to locate S.L.'s father. The only phone number she had for him was disconnected.

2

The following day, when mother was ready to be discharged from the hospital, L.H. arrived to take custody of S.L.; L.H. was notified that Riverside County would be taking custody. L.H. acknowledged a prior "incident" with the Department in 1998 and said she would work with the Department to "have the incident cleared/expunged and [would] continue to fight to obtain custody of" S.L. S.L. was placed in a Riverside County approved, confidential foster home.

Days later, Riverside County filed a Welfare and Institutions Code[1] section 300 petition. The petition alleged that the newborn minor came within section 300, subdivisions (b)(1) and (g). Pursuant to section 300, subdivision (b)(1), Riverside County alleged that S.L. "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of . . . her parent . . . to supervise or protect the child adequately." Specifically, Riverside County alleged that mother had prior substantiated allegations of general neglect as the result of "substance abuse" relative to her other children C.L. and B.L. Mother was given services but failed to reunify with C.L., and C.L.'s father was given sole legal and physical custody. Mother also failed to reunify with B.L., and her parental rights were terminated.

Pursuant to section 300, subdivision (g), Riverside County alleged that S.L. was either "left without any provision for support; or the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child . . . ." In the allegation labeled "g-1," Riverside County alleged that mother was "currently incarcerated and unavailable to provide the child with care and support." In their "g-2" allegation, Riverside County alleged that "[t]he exact whereabouts of father . . . [are] unknown, and he has failed to make himself available to provide care and support for the child."

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

The Riverside County juvenile court ordered S.L. detained on October 30, 2024. Mother was denied in-person visitation while she remained incarcerated but was given services.

On December 3, 2024, the Riverside County social worker filed a motion to transfer the dependency proceeding to Yuba County. Three days later, Riverside County submitted their jurisdiction report to the juvenile court. Riverside County reported that S.L. remained in a confidential foster home and was doing well. Riverside County still could not locate S.L.'s father.

B. *Historical Dependency Proceedings -- Documented in the Jurisdiction Report*

1. *N.L.*

On September 11, 2009, mother called the Department to say she and her two-week-old baby, N.L., would soon be homeless and had nowhere to go. Mother admitted to a history of smoking methamphetamine "every day, all day." She said she last used methamphetamine the week before. Mother also admitted to using drugs throughout her pregnancy and getting limited prenatal care. The Department offered her a voluntary family maintenance plan.

On September 21, 2009, the Department received a report from the local hospital expressing their concern for N.L.[2] Mother tested clean and told the hospital she had been clean for two years. The hospital said mother was " 'not bonding well with the baby,' was focused only on herself, and would minimally feed the baby and then return him to the nursery." Riverside County reported the disposition as follows: "SDM recommends evaluate-out, however, based on mother's CPS/dependency treatment as a minor, that

---

[2] The record does not identify which baby but given the timing, we presume it to be N.L.

substance issues/mental health issues may be present based on the mother's statements and as the mother has requested services overridden to a 10-day response."[3]

2. *C.L.*

In February 2018, mother was admitted to a local hospital in labor with S.L.'s half sibling, C.L. At admittance, mother tested presumptive positive for methamphetamines. Medical records revealed that mother had only one visit for prenatal care and there was no information about mother's substance use. The records provided "very little information about the mother's older child; except that the child was not in the mother's care, but with a relative."[4] C.L. was delivered by cesarean section and placed in the neonatal intensive care unit (NICU). After C.L.'s birth, mother and C.L. both tested negative for drugs.

Approximately two weeks later, law enforcement responded to a report of domestic violence between mother and C.L.'s father. Mother argued with father when she found him with a methamphetamine pipe. The argument turned physical, with mother kicking his car and scratching and biting him. Mother was holding two-week-old C.L. during the altercation. Mother was arrested and C.L. was placed into protective custody.

The Department initiated a "family reunification case" for C.L. alleging "general neglect and emotional abuse." The Department further alleged "parental substance abuse, domestic violence, and the condition of the home to include animal feces." The case was closed when C.L.'s father obtained full legal and physical custody of C.L.

---

[3] In its February 2025 disposition report, the Department reported that a woman who is not mother applied to Yuba County for child support of N.L.

[4] The record does not identify the "older child" but, presumably, it is N.L.

### 3. *B.L.*

In January 2021, mother went to a local hospital; she was pregnant and had high blood pressure. She left that hospital against medical advice but soon went to a different local hospital where she gave birth to S.L.'s full sibling, B.L. B.L. also was delivered by cesarean section and placed in the NICU. The next day, mother was "yelling and screaming and upset with hospital staff." She threatened to leave the hospital with B.L. against medical advice.

Mother reported to the Department that she had other children living "with relatives per her arrangements." She admitted to using methamphetamine through her first trimester; she stopped using when she was incarcerated and "she remained sober for the time she was there and after." Mother denied any mental health history, but records reflected "several psych holds."

A few months later, the Department launched a "family reunification case" relative to B.L. "due to parental substance abuse, mental health, and homelessness." Mother and father failed to reunify; their parental rights were terminated in May 2022, and a permanent plan for adoption was established. B.L. was adopted in July 2022.

### 4. *Mother's Narrative*

Mother reported to Riverside County that she first started using drugs at 12 or 13 years old, including marijuana and methamphetamine. She first got sober at 14 years old but relapsed at 19 years old. Following her arrest in 2018, mother fell into a "deep depression." She found herself without "support, housing, and financial stability." She stopped trying to reunify with C.L., gave up on her sobriety, and told the father to take custody.

After she gave birth to B.L. in 2021, mother was " 'on the run' " from her parole officer. She soon turned herself in and got sober; the court did not put her in jail because she was a new mother. Mother tried to get into several rehabilitation programs but, because of COVID-19, the programs kept closing. After B.L. was removed from her

custody, mother relapsed again.  She continued to use drugs until she found out she was pregnant with S.L.

　　5. *Jurisdiction Hearing/Transfer to Yuba County*

On December 5, 2024, the maternal aunt, D.P., who lived in Sutter County, was approved for emergency placement of S.L.  (Days later, the juvenile court in Riverside County conducted the jurisdiction hearing.  The court read, considered, and admitted into evidence the detention and jurisdiction reports.  Mother asked the court to transfer the case to Yuba County that day, "take jurisdiction, [and] hold off on disposition."  The court found true the allegations in the operative petition, "took jurisdiction," and ordered the matter transferred to Yuba County for disposition.

A "transfer in" hearing was set in Yuba County for December 26, 2024.  That hearing was later continued by the Yuba County Juvenile Court to January 16, 2025, at which time the court accepted the transfer in, appointed counsel, and set the disposition hearing for February 20, 2025.

On February 18, 2025, mother filed a motion to dismiss the section 300 petition for "failure to state a cause of action and insufficiency of the evidence."  Boldface and capitalization omitted.)  The following day, the Department submitted its disposition report recommending continued services to mother.  The Department reported that S.L. continued to live with D.P. in Sutter County, appeared "overall happy," and was developmentally on track.

On March 27, 2025, the juvenile court in Yuba County heard mother's motion to dismiss the petition and presided over the disposition hearing.  At the outset of the hearing, mother orally amended her motion to dismiss "to be a motion to strike the G-1 and G-2 allegations at this point.  We are not making any argument about the B-1 allegation.  I have reviewed both the detention report and the jurisdiction report, which were admitted in evidence at the jurisdiction hearing.  There would have been sufficient

7

evidence that it was more than just the evidence of drug abuse that would have qualified under B-1, so we are not making an argument as to B-1."

The juvenile court denied mother's motion: "I'm not going to relitigate what Riverside County has already litigated." The court ordered in-person visitation between mother and S.L. three times a week, supervised by D.P. The court continued reunification services for mother and set the six-month review hearing. Mother filed a timely notice of appeal.

## DISCUSSION

### I

### *Failure to State a Claim*

Mother contends the section 300 petition failed to state a cause of action -- a claim akin to a demurrer. We disagree.

In the civil context, a complaint, with certain exceptions, need only contain a "statement of the facts constituting the cause of action, in ordinary and concise language" (Code Civ. Proc., § 425.10, subd. (a)(1)) and will be upheld " 'so long as [it] gives notice of the issues sufficient to enable preparation of a defense' " (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 549-550). The same rule applies here. (See *Estate of Wooten* (1880) 56 Cal. 322, 325 [a petition in probate proceedings is akin to a complaint or other pleadings in a civil action].)

In reviewing a complaint's legal sufficiency, a court will treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of law. (*Esparza v. Kaweah Delta Dist. Hospital* (2016) 3 Cal.App.5th 547, 552.) It is well settled that a "demurrer lies only for defects appearing on the face of the complaint." (*Stevens v. Superior Court* (1999) 75 Cal.App.4th 594, 601.) "We not only treat the demurrer as admitting all material facts properly pleaded, but also 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.) For

8

purposes of ruling on a demurrer, the complaint must be construed liberally by drawing reasonable inferences from the facts pleaded. (*Wilner v. Sunset Life Ins. Co.* (2000) 78 Cal.App.4th 952, 958.)

Mother claims the section 300 petition fails to state a cause of action sufficient to support jurisdiction because there was "no allegation of current substance abuse" and "no allegation that she failed to protect S.L." Mother ignores the reasonable inferences to be drawn from the facts pleaded in the petition; namely, that mother had a history of drug abuse that resulted in her losing custody of S.L.'s two siblings, and maybe a third. Her history included periods of sobriety and relapse. It is reasonable to infer from those allegations that mother could still be using drugs or may use them again in the future. (See *In re T.V.* (2013) 217 Cal.App.4th 126, 133 [a parent's past conduct is a good predictor of future behavior].) It also is reasonable to infer that, given mother's history with the Department, S.L. could be at risk of neglect or harm as a result of mother's drug use. (*Ibid.*)

Mother also argues that because she *did* provide a plan for the care and support of S.L., neither of the section 300, subdivision (g) allegations were sufficient to state a cause of action. Mother's argument conflates her demurrer with her claim of insufficient evidence. Whether there was sufficient evidence to support a claim that she was incarcerated and unavailable to provide care for S.L., the bare allegation that she was incarcerated and unavailable to provide care for S.L. is sufficient to state a claim. (§ 300, subd. (g) [authorizing juvenile court jurisdiction if a parent is incarcerated and cannot arrange for care of the child].) The same is true for the allegation that S.L.'s father could not be found and had not made himself available to care for S.L. (§ 300, subd. (g) [authorizing juvenile court jurisdiction if a parent's whereabouts are unknown].)

In short, mother's demurrer on appeal fails.

## II

### *Sufficiency of Evidence -- Section 300, Subdivision (b)*

Mother also claims there is insufficient evidence to support jurisdiction pursuant to section 300, subdivision (b)(1).  We disagree.

As an initial matter, the Department contends mother waived this claim in the trial court when she modified her motion to dismiss the petition to a motion to strike only the section 300, subdivision (g) allegations.  We will assume, without deciding, that mother did not waive this claim and address the merits.  On the merits, mother's claim fails.

Pursuant to section 300, subdivision (b)(1)(A), the juvenile court may exercise jurisdiction over a child if it finds "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . :  [¶]  (A)  The failure or inability of the child's parent . . . to adequately supervise or protect the child."  "[T]he purpose of section 300, subdivision (b) is to protect the child from a substantial risk of *future* serious physical harm and that risk is determined as of the time of the jurisdictional hearing."  (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1397.)  Accordingly, "[w]hile past harmful conduct is relevant to the current risk of future physical harm to a child [citations], the evidence as a whole must be considered.  '[P]revious acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur."  (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025.)

" ' "In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings . . . , we determine if substantial evidence, contradicted or uncontradicted, supports them.  'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.]  'We do not reweigh the evidence or exercise independent judgment, but merely determine if

10

there are sufficient facts to support the findings of the trial court.' " ' " (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.)

Here, mother acknowledged a long history of drug use that began when she was a teenager. She had periods of sobriety, but they ended in relapse, often when mother became overwhelmed by the circumstances of her life. Mother's drug use likely contributed to her arrest for domestic violence and caused her to lose custody of at least two, and maybe three, of her older children. There was evidence at the jurisdiction hearing that mother was clean at the time she gave birth to S.L. That is, however, only a moment in time. Looking at her entire history with drugs and the Department, it was reasonable for the juvenile court to infer that S.L. may be at risk of future harm if mother relapses into drug use again. This is sufficient to sustain the juvenile court's jurisdictional findings.

## III

### *Section 300, Subdivision (g)*

Mother also argues the juvenile court "improperly took jurisdiction based on [section 300,] subdivision (g)." (Boldface and capitalization omitted.) The Department concedes the court improperly took jurisdiction based on the g-1 allegation, which alleged that mother was incarcerated and unavailable to provide S.L. with care and support. We will accept the Department's concession and direct the juvenile court to strike the g-1 allegation in the section 300 petition.

The parties do not agree, however, on the fate of the section 300 petition, g-2 allegation. The g-2 allegation provides that the whereabouts of S.L.'s father were unknown, and he had not made himself available to care for S.L. Mother argues these allegations also should be dismissed because mother made "an appropriate plan for the care of" S.L., so the search for S.L.'s father "was unnecessary." Whether the search for S.L.'s father was necessary is not a legal basis for dismissing the g-2 allegation. Mother cites no authority to suggest otherwise.

11

It is undisputed that, at the time of the jurisdiction hearing, father's whereabouts were unknown, and he had not made himself available to care for S.L. This would be a sufficient basis for asserting jurisdiction over S.L. (See § 300, subd. (g).) Accordingly, this claim fails.

DISPOSITION

We reverse the jurisdictional order with respect to the g-1 allegation and direct the juvenile court to dismiss allegation g-1 from the petition. In all other respects, the order is affirmed.

/s/
WISEMAN, J.*

We concur:

/s/
KRAUSE, Acting P. J.

/s/
MESIWALA, J.

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.